IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS BERRY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:10cv78-WHA-WC |
| | ) | (WO) |
| MEADWESTVACO PACKAGING | ) | |
| SYSTEMS, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

### I.  INTRODUCTION

This case is before the court on a Motion for Summary Judgment filed by Defendant

MeadWestvaco Packaging Systems, LLC ("MeadWestvaco") (Doc. #22).  The Plaintiff, Thomas

Berry ("Berry"), filed an Amended Complaint in this case alleging a failure to accommodate his

religious beliefs under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*  The court

has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question).  For the reasons

to be discussed, the Motion for Summary Judgment is due to be GRANTED.


### II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if there is no genuine issue as to any material fact and . . .

the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S.

317, 322 (1986).

The party asking for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion," relying on submissions "which it believes

demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  Once the moving party

has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A), (B). Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a).

## III. <u>FACTS</u>

The submissions of the parties establish the following facts, viewed in a light most favorable to Berry, the non-movant:

**A.      MeadWestvaco Hires Berry and Learns of his Religious Beliefs**

Berry is a Jehovah's Witness.  During the relevant times of this case, Berry attended a

Kingdom Hall[1] in LaGrange, Georgia.  Berry states that he is scripturally obligated to attend five

religious meetings per week.  Berry's Kingdom Hall held meetings in the evenings on Tuesdays

and Wednesdays, and during the afternoon on Sundays.

Berry began working for MeadWestvaco as an operator[2] in August 2005 at its Lanette,

Alabama facility.  It took approximately 30 minutes for Berry to drive from this facility to his

Kingdom Hall.  Berry Dep. at 129:15-17.  At his interview with MeadWestvaco, Berry told his

interviewers that he was a Jehovah's Witness, and that he needed to attend five religious

meetings per week, as well as a one-day meeting, a two-day meeting, and a three-day meeting

each year.  At the time he applied for the job, Berry did not know what times his meetings would

be held, so he stated that he would have to let MeadWestvaco know about the times later.

However, Berry and his interviewers agreed that work would not conflict with his meetings

because Berry was originally scheduled to work Monday through Friday, from 7 a.m. to 3 p.m.,

and Berry knew that his meetings would be held on the evenings and weekends.  *See* Berry Dep.

at 87:7 - 88:1.

**B.      Berry's Work Schedule Begins to Conflict with Berry's Religious Obligations**

---

[1]Jehovah's Witnesses refer to their church buildings as "Kingdom Halls."  *See* Berry
Dep. at 39:23 - 40:3.

[2]Initially, Berry worked as a right-angle gluer operator.  However, in early 2007,
MeadWestvaco discontinued its use of the right-angle gluer, and as a result, MeadWestvaco
reassigned Berry to work as a straight-line gluer operator.  Berry Dep. at 111:10-112:9.

On March 12, 2007, MeadWestvaco changed the work schedule for operators, such as Berry. Specifically, all operators were scheduled to work on 12-hour shifts, either from 7 p.m. to 7 a.m., or from 7 a.m. to 7 p.m. Additionally, the days each employee was scheduled to work changed each week. Miller Aff. ¶ 5. Operators were assigned to shifts on the basis of seniority, and because Berry was the least senior operator, he was assigned to the 7 p.m. to 7 a.m. shift. Berry Dep. at 114:19 - 115:19.

Due to the new schedule, Berry was assigned to work during either his Tuesday or Wednesday evening religious meetings each week. Upon learning of this conflict, and before the new schedule was implemented, Berry began looking for an operator to swap shifts with him, but was unsuccessful. Berry Dep. at 118:5 - 119:19. However, Berry found an assistant operator, Calvin Peterson ("Peterson"),[3] who agreed to swap shifts with Berry. Berry Dep. at 119:17 - 120:20.

Berry then met with Les Roderfield ("Roderfield"), a manager, to notify him of the schedule conflict and his proposed solution of allowing Peterson, an assistant operator, to substitute for Berry, an operator. Berry Dep. at 121:21 - 124:3. Roderfield refused Berry's proposal, directing Berry to use his vacation time for the absences, or to find an operator to fill in for him. Berry Dep. at 121:21 - 124:3, 127:19-23. Roderfield noted that company policy prohibits assistant operators to substitute for operators. Berry Dep. at 123:10 - 124:23. Berry complained that he did not have enough vacation time to cover all of his religious meetings, and that "none of the operators wanted to switch," and in response, Berry testified that Roderfield

---

[3]In their briefs, MeadWestvaco refers to Peterson as "Kelvin Peterson," and Berry refers to Peterson as both "Kelvin Peterson" and "Calvin Peterson." Peterson himself gave the name "Calvin Peterson" in his deposition.

said: "well, find another job."  Berry Dep. at 121:21 - 124:7, 127:22-23.  Roderfield then

directed Berry to speak with MeadWestvaco's human resources manager, Martie Schrimsher

("Schrimsher").  Berry Dep. at 124:2 - 124:7.

Berry told Schrimsher about the scheduling conflict.  Berry testified that she stated, in

response: "MeadWestvaco never has and never will have anything in place to accommodate

someone's religion."  Berry Dep. at 126:16 - 127:5.  However, Berry admitted that Schrimsher

also said that Berry could swap shifts with other operators.  Berry Dep. at 127:12-13.

Schrimsher rejected Berry's proposal to swap shifts with Peterson, because company policy

prohibited filling an operator position with an assistant operator.  Berry Dep. at 127:12 - 128:7.

Berry also scheduled a meeting with the plant manager, Pete Miller ("Miller"), but this

meeting was canceled.  Berry Dep. at 139:3-16.  In a passing conversation between Miller and

Berry, Miller deferred to Schrimsher's decision.  Berry Dep. at 139:17 - 141:13.


### C.       MeadWestvaco's Attendance and Vacation Policies

MeadWestvaco has a company attendance policy.  Under the system, an employee is

assessed a certain number of points for attendance issues, and these points remain on the

employee's record for 12 months after receipt.  An employee receives one point for an absence

and one-half point for a lesser infraction, such as tardiness.  When an employee receives his first

point, he receives an informal counseling.  A second point results in a verbal warning.  A third

point results in a written warning.  A fourth point results in a final warning, during a meeting

with the employee, department manager, and plant manager, in the presence of a human

resources manager or representative.  During this meeting, the parties attempt to resolve the reason for the employee's attendance problems.

A fifth point results in a final letter warning and suspension for three days.  If an employee receives a sixth point, the department manager, plant manager, and human resources manager review his personnel record and points, and then a decision is made regarding his employment status.

MeadWestvaco also has a company vacation policy, which gives an employee a certain amount of vacation time, based on the length of the employee's tenure at MeadWestvaco. Employees may also purchase up to one week of vacation.  Vacations are scheduled based on seniority.  Additionally, the vacation policy specifically states that "[v]acation coverage will be filled by the same position (not a lesser position that carries Certification) on the opposite shift. *Only in emergency situations will managers approve a lesser-named skill for coverage*."  Berry Dep. Ex. 10 (emphasis added).


**D.      Berry Receives Attendance Points and Resigns**

Because Berry could not find an operator willing to swap shifts with him, he began using vacation time so he could be excused from work to attend his religious meetings.  Generally, MeadWestvaco granted Berry's vacation requests.  When MeadWestvaco granted these requests, Roderfield scheduled operator Paul Foster ("Foster"), who worked the same hours as Berry on different days of the week, to work for Berry.  Foster complained that he did not want to work Berry's shift, because it increased Foster's time away from his family.  Roderfield Dep. at 30:7 - 32:12.  Roderfield did not remember if he asked Foster whether he would be willing to swap

shifts with Berry instead of filling in for Berry when Berry took vacation time.  Roderfield Dep. at 31:25 - 32:23.

On several instances, Berry's vacation requests were denied, and when Berry subsequently failed to appear at work, he was assessed attendance points under MeadWestvaco's attendance policy.  By July 17, 2007, Berry had accumulated three and a half points under the attendance policy.

Berry scheduled a meeting with Schrimsher on July 17 to discuss his attendance points, yet this meeting never occurred.  Berry arrived at Schrimsher's office, but she was in a meeting with someone else, so Berry waited outside her office for the meeting to end.  He then left before Schrimsher could meet with him.

On July 23, 2007, without speaking to Schrimsher or anyone else at MeadWestvaco, Berry resigned.  Berry Dep. at 165:3-13, 166:19 - 168:4.  Berry did this because, after he calculated the amount of vacation time he had left as well as his attendance points, he concluded that termination was inevitable, and he wanted to avoid termination.  Berry Dep. at 166:19 - 168:3.

Berry filed a Charge of Discrimination with the EEOC on August 13, 2007.  Upon receiving his Notice of Right to Sue, Berry filed the instant action on January 20, 2010.

## IV.  DISCUSSION

Berry alleges that MeadWestvaco constructively discharged him, while failing to accommodate his religious beliefs, in violation of Title VII.  MeadWestvaco argues that it is entitled to summary judgment because Berry was not constructively discharged, instead, he

voluntarily resigned.  MeadWestvaco further argues that it satisfied its duty of reasonable accommodation or, in the alternative, that it could not reasonably accommodate Berry without undue hardship.  The court concludes that summary judgment is due to be granted because MeadWestvaco could not accommodate Berry without undue hardship on its business.

**A.      Legal Framework**

Title VII prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII defines "religion" as "including 'all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that [it] is unable to reasonably accommodate . . . [an] employee's religious observance or practice without undue hardship on the conduct of the employer's business."  *Beadle v. Hillsborough Cnty. Sheriff's Dep't*, 29 F.3d 589, 591-92 (11th Cir. 1994) (quoting 42 U.S.C. § 2000e(j)).

An employer violates Title VII not only by treating employees differently on the basis of religion, but also by failing to reasonably accommodate an employee's sincerely held religious beliefs. *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 74-76 (1971).  To prevail on a failure to accommodate claim, a plaintiff must first establish a prima facie case.  *Dixon v. Hallmark Cos., Inc.*, 627 F.3d 849, 855 (11th Cir. 2010).  If a plaintiff establishes a prima facie case, the burden shifts to the employer to either show that it afforded the employee a reasonable accommodation, or that it could not reasonably accommodate the employee without undue hardship.  *See Beadle*, 29 F.3d at 592.

The court assumes, without deciding, that Berry has satisfied his prima facie case. Therefore, the issue in this case is whether MeadWestvaco met its burden of reasonable accommodation.

## B.      Reasonable Accommodation

To satisfy its burden of reasonable accommodation, an employer must show that the employee was afforded a reasonable accommodation, or that the employer could not reasonably accommodate the employee "'without undue hardship on the conduct of the employer's business.'"  *Beadle*, 29 F.3d at 591-92 (quoting 42 U.S.C. § 2000e(j)).  A "reasonable accommodation" is an accommodation that "'eliminates the conflict between employment requirements and religious practices.'"  *Morrissette-Brown v. Mobile Infirmary Med. Ctr.*, 506 F.3d 1317, 1322 (11th Cir. 2007) (quoting *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986)).  An "undue hardship" is "any act that would require an employer to bear greater than a 'de minimis cost' in accommodating an employee's religious beliefs."  *Beadle*, 29 F.3d at 592 (citing *Hardison*, 432 U.S. at 75).  An employer need not "give an employee a choice among several accommodations . . . [or] demonstrate that alternative accommodations proposed by the employee constitute undue hardship . . . . [r]ather, the inquiry ends when the employer shows that a reasonable accommodation was afforded the employee, regardless of whether that accommodation is one which the employee suggested."  *Id.*  In addition to the employer's duties, an employee has a reciprocal "duty to make a good faith attempt to accommodate his religious needs through means offered by the employer."  *Id.* at 593 (finding that a plaintiff did not satisfy

9

this duty when the plaintiff failed to make a proper attempt to find another employee to swap shifts with).

MeadWestvaco attempted to accommodate Berry by (1) allowing Berry to swap shifts with other operators; and (2) allowing Berry to use his vacation time to avoid working during his meeting times.  MeadWestvaco argues that, under Eleventh Circuit precedent, these acts constitute reasonable accommodations.

The Eleventh Circuit, and other courts have held that "authorizations of voluntary swaps instituted by employers within neutral rotating shift systems constitute reasonable accommodations under Title VII."  *Beadle*, 29 F.3d at 593.  Employers need not "actively assist in coordinating other shift arrangements" to afford an employee a reasonable accommodation.  *Morrissette-Brown*, 506 F.3d at 1323.  Instead, "the employer [will have] done all that was reasonably required of it when it [is] amenable to, and receptive to, efforts that the employee could have conducted for himself to arrange his own schedule swap."  *Id.* (stating that, when the employer instructed the plaintiff to find another employee to swap shifts with, approved all of the plaintiff's shift swaps, and posted a master schedule of all employees' schedules for the plaintiff to use, "[t]hese steps alone likely constitute reasonable accommodations") (quoting *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1157 (10th Cir. 2000)).

There is a disagreement of fact as to whether Berry was afforded a reasonable accommodation.  In this case, reading the facts in the light most favorable to the non-movant, (1) Berry made a good faith effort to solicit a schedule swap by asking all potential operators who worked different shifts than he did to swap with him; (2) none of these operators were willing to swap shifts with Berry; and (3) Berry had far too little vacation time to comply with his

attendance requirements at work and to attend his religious meetings.  If these facts are true, then MeadWestvaco's accommodations did not eliminate Berry's work-religion conflict to any major extent.[4]  *Cf. McGuire v. Gen. Motors Corp.*, 956 F.2d 607, 610 (6th Cir. 1992) (holding it is not a reasonable accommodation to allow the plaintiff to swap shifts when the employer circulated surveys that created negative attitudes about religious accommodation and made it "virtually impossible" for the plaintiff to find a substitute); *Cooper v. Oak Rubber Co.*, 15 F.3d 1375, 1379 (6th Cir. 1994) (holding that it is not a reasonable accommodation when a plaintiff is "faced with the choice of working on the Sabbath or potentially using all of her accrued vacation to avoid doing so").

Some cases suggest that a shift swap accommodation is reasonable even if a plaintiff cannot *always* find another employee to swap with.  *See, e.g.*, *Beadle*, 29 F.3d at 591-93 (noting that, while the employee could not find anyone to swap with, the employee also failed to take full advantage of the shift swap system); *Sanchez-Rodriguez v. AT&T Wireless*, 728 F. Supp. 2d 31, 42 (D. Puerto Rico 2010) ("Several courts . . . hold that allowing an employee to swap shifts with other employees to resolve a religious conflict constitutes a reasonable accommodation, even if finding an alternate shift was *not always* successful.") (emphasis added) (citing cases).  However, neither party has cited any case where a shift swap was found reasonable despite the fact that plaintiff put forth a good faith effort to find another employee to swap shifts with, yet *never* could find someone willing to do so.  Therefore, the court concludes that there is at least an issue of fact as to whether MeadWestvaco offered Berry a reasonable accommodation.

---

[4]The EEOC's guidelines state that voluntary shift swaps are generally a reasonable accommodation when "a voluntary substitute with substantially similar qualifications *is available*."  29 C.F.R. § 1605.2(d)(1)(I) (emphasis added).

C.     **Undue Hardship**

The court now must determine whether there was a reasonable accommodation available that would not have been an undue hardship to MeadWestvaco. Berry has suggested several accommodations that he contends are not an undue hardship.

First, Berry proposed to MeadWestvaco that he could swap shifts with Peterson, an assistant operator. MeadWestvaco rejected this proposal, and argues that allowing Peterson to fill in for Berry, an operator, on a regular basis would be an undue hardship. MeadWestvaco admitted that Peterson occasionally filled in for operators, however, this was only in emergency situations, and did not occur regularly. Miller Dep. at 70:23-24; Roderfield Dep. at 48:6-8; Peterson Dep. at 15:22 - 16:25 ("[I]t usually just would be if my operator don't [sic] show up or calls out, you know, or he leaves work early. That's the only way I got a chance to really just fill in, operate the gluer. Other than that, I didn't.").[5]

There were several reasons for MeadWestvaco to reject Berry's proposal to allow Peterson to fill in for Berry on a regular basis. Miller testified that "assistant operators are not really qualified to be gluing operators on [Berry's] line," and that assistant operators might

---

[5]Berry contends that it was "standard practice" for assistant operators to fill in for operators. *See, e.g.*, Pl.'s Br. in Opp. to Def.'s Mot. for S.J. at 27-28. Yet Berry's cited evidence does not prove assistant operators regularly filled in.

Berry admitted that he only knew of two specific occasions when assistant operators covered for operators, and that was because an operator "left at the beginning of the shift" and because an operator did not show up for his shift. Berry Dep. at 105:5-23. Berry also admitted that he did not really know who covered for him when he was off on vacation, though stated that it was "[u]sually another operator." Berry Dep. at 105:5-6. Berry speculated that it was "common knowledge in the plant" that assistant operators would cover for operators, but did not offer specific evidence supporting this claim. Berry Dep. at 107:9.

Berry's cited evidence is either consistent with MeadWestvaco's statement that assistant operators only filled in occasionally in emergency-type situations, or is speculation. It does not create an issue of fact on this point.

reduce the quality of the product while filling in for operators.  Miller Dep. 69:13-14; 71:4-25.

Miller explained that in the few times an assistant operator filled in for an operator, a "qualified

person" such as an operator had to perform a quality check of the assistant operator's work every

hour.  Miller Dep. at 71:12 - 72:6.  Miller also stated that customers occasionally audit

MeadWestvaco to ensure that qualified personnel are running the lines.  Miller Dep. at 72:21-23.

Significantly, Peterson himself stated that he had to get additional training before he could

become an operator, and that, in the few situations where he had filled in for an operator in the

past, he had some trouble doing the job.  Peterson Dep. at 13:18-22, 16:8-22.[6]

Accordingly, company policy prohibited assistant operators to fill in for operators except

in emergency circumstances, such as when an operator was sick or did not show up to work.

*See, e.g.*, Schrimsher Dep. at 14:21-24 ("They were allowed to swap with another person, as long

as that person held the same position that they did.  They could not swap with someone of a

lesser position.  The reason for that being is because the person in the lower position would not

be qualified[.]").

The court agrees with MeadWestvaco that substituting an assistant operator for an

operator on a regular basis constitutes an undue hardship.  As previously stated, an undue

hardship is "any act that would require an employer to bear greater than a 'de minimis cost' in

accommodating an employee's religious beliefs."  *Beadle*, 29 F.3d at 592.  When an employer is

---

[6]Peterson's deposition testimony read as follows:
  Q.    Okay.  Did you have any troubles doing the job?
  A.    A little.
  Q.    What problems did you have?
  A.    Basically troubleshooting, you know.  I wasn't all the way up to par with
        my troubleshooting skills.
Peterson Dep. at 13:18-22.

required to replace a trained worker with an untrained one, and the employer presents evidence

that this replacement will cause inefficiencies and product quality problems, that is more than a

de minimis cost.[7]  *E.E.O.C. v. BJ Servs. Co.*, 921 F. Supp. 1509, 1514 (N.D. Tex. 1995) (holding

that it was an undue hardship to replace plaintiff with untrained personnel, because of testimony

that this replacement could create safety concerns, inefficiencies, or decreased production);

*Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 146 (5th Cir. 1982) (finding it an undue hardship

to have "Luther substitute for Brener, [because it would] result[] in decreased efficiency,

economic loss, and increased risk to patients").  This court will not second-guess

MeadWestvaco's reasoned business judgment on this issue.[8]  Accordingly, the court finds that

Berry's proposal of swapping shifts with Peterson would be an undue hardship.

     Second, Berry argues that MeadWestvaco should have altered the work schedules of its

employees to cover his shift.  For example, Berry noted that Miller stated in his testimony,

hypothetically, that MeadWestvaco could have had (1) "lead men" cover Berry's shift; (2) other

operators occasionally "stay over" the length of their shift.  Miller Dep at 63:8 - 64:15.

     This is an undue hardship.  The Supreme Court in *Hardison* explicitly stated that an

employer does not have to treat other employees differently merely to satisfy the religious

---

[7]The EEOC's guidelines refer to shift swaps as a reasonable accommodation when they involve an employee and a "voluntary substitute with *substantially similar qualifications*."  29 C.F.R. § 1605.2(d)(1)(I) (emphasis added).

[8]Some courts require an employer to prove more than a "hypothetical hardship" in proving an undue hardship.  *See, e.g., Hellinger v. Eckerd Corp.*, 67 F. Supp. 2d 1359, 1365 (S.D. Fla. 1999) (citing cases).  Although none of those cases is binding on this court, the court concludes that it is not a mere "hypothetical hardship" to require an employer to replace a qualified worker with an unqualified one on a regular basis, when the employer presents testimony of how and why this will harm the employer's business.

objections of a single employee. *Hardison*, 432 U.S. at 81 ("[T]o give Hardison Saturdays off, TWA would have had to deprive another employee of his shift preference . . . . Title VII does not contemplate such unequal treatment."). By forcing "lead men" to perform extra work, or by forcing other employees to work longer hours, MeadWestvaco would be discriminating *in favor* of Berry and against his co-workers. *Id.* ("It would be anomalous to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the shift and job preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others, and we conclude that Title VII does not require an employer to go that far.").

Third, Berry suggests that MeadWestvaco could have "seen about some kind of a shift modification." Pl.'s Br. in Opp. to Def.'s Mot. for S.J. at 28 n.25 (quoting Miller Dep. at 63:8 - 64:15). However, the *Hardison* court emphasized that it is an undue hardship to force an employer to change the way it schedules its employees merely to satisfy the needs of an employee with a religious objection to the schedule. *See Hardison*, 432 U.S. at 80-81.

Fourth, Berry argues that MeadWestvaco should have asked Foster to agree to a shift swap with Berry, rather than forcing Foster to work extra hours during the days Berry took vacation. However, Berry's own evidence shows that this would be an undue hardship. Berry told Roderfield that "none of the operators would switch," Berry Dep. at 127:22-23 (emphasis added), and Foster is an operator.[9] Forcing unwilling employees to swap shifts with an

---

[9]To the extent that Berry argues that he did not ask all of the other operators who could have swapped with him, including Foster, to swap shifts with him, Berry failed in his reciprocal duty to "make a good faith attempt to accommodate his religious needs through means offered by the employer," and this court would grant summary judgment to MeadWestvaco on that ground. *See Beadle*, 29 F.3d at 593.

employee who has a religious objection to the schedule is not required by Title VII. *Hardison*, 432 U.S. at 81.

In sum, while there is an issue of fact as to whether MeadWestvaco reasonably accommodated Berry, there is no issue of fact that MeadWestvaco could not reasonably accommodate Berry without an undue hardship.

## D.      Disparate Treatment

Berry makes much of the fact that Roderfield told Berry to "find another job," Berry Dep. at 121:21 - 124:7, 127:22-23, and that Schrimsher told him that "MeadWestvaco never has and never will have anything in place to accommodate someone's religion," Berry Dep. at 126:16 - 127:5. However, Berry admitted that, during those conversations, both Roderfield and Schrimsher actually suggested accommodations to Berry. Berry Dep. at 121:21 - 124:3, 127:12-23. In any event, these statements are not relevant to a religious accommodation claim; instead, if relevant at all, they might be relevant to a claim of disparate treatment on the basis of religion, which Berry has not alleged in this case. *See, e.g.*, *E.E.O.C. v. GKN Driveline N. Am., Inc.*, No. 1:09CV654, 2010 WL 5093776, at *12 (M.D.N.C. Dec. 8, 2010) ("This case, however, involves not a disparate treatment claim, but rather a religious accommodation claim."); *Good Shepherd Manor Found., Inc. v. City of Momence*, 323 F.3d 557 (7th Cir. 2003) (holding, in the context of reasonable accommodation of disabilities, "reasonable accommodation is a theory of liability separate from intentional discrimination").

## V.  <u>CONCLUSION</u>

For the foregoing reasons, the Motion for Summary Judgment is GRANTED.


Done this 14th day of March, 2011


/s/ W. Harold Albritton
W. HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE

17